UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Douglas Dynamics, LLC, d/b/a/ Western
Products,

                    Plaintiff,

        v.

B&P SUPPLY, INC.,

                    Defendant

CIVIL ACTION
Docket No: 3:04-cv-11467-MAP

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
WITH INCORPORATED MEMORANDUM OF LAW**

Plaintiff Douglas Dynamics, LLC d/b/a Western Products ("Western") hereby moves,

pursuant to Rule 56 of the Federal Rules of Civil Procedure, for a summary judgment in its favor

on Counts I and II of the Complaint, and respectfully requests that the Court award it damages in

the principal amount of $118,727.12, plus interest on that amount accumulating at the rate of

1.5% per month after May 2004,[1] and costs of suit.  Western also moves for a summary

judgment in its favor on all counts of B&P's Counterclaim.  Western submits the following

memorandum of law in support of its Motion.

**Introduction**

The grounds for granting this motion are straightforward and based on the following

undisputed material facts: (1) B&P admits that it purchased snow and ice removal equipment and

accessories from Western during the period from November 2003 through March 2004; (2) B&P

did not pay Western in full for all of the products that it purchased during that period; (3) the

terms of sale governing the purchases made by B&P required payment in full within 30 days of

---

[1] As of July 15, 2005, approximately $29,171.10 of interest has accumulated on the amount owed to Western by Defendant B&P Supply, Inc. ("B&P").  (Western's Statement of Undisputed Material Facts ("SMF") ¶ 37.)

the invoice date, and provided for a 1.5% service charge per month on amounts overdue and unpaid; (4) Western made repeated demands to B&P to pay for the products it purchased; (5) despite those demands, B&P admits that it has not paid Western in full for those products. Accordingly, B&P has breached the terms of the sales agreements and Western is entitled to summary judgment on its claims against B&P as a matter of law.

B&P has also asserted a counterclaim alleging claims for breach of contract, wrongful termination, and violations of Sections 1 and 2 of the Sherman Act, as well as chapters 93 and 93A of the Massachusetts General Laws. The gist of B&P's claims is that Western acted improperly because it allegedly refused to continue to supply B&P with snow and ice removal equipment, even though some of the invoices for B&P's purchases were more than 90 days overdue. It is undisputed, however, that Western never actually refused to sell products to B&P. After B&P had allowed its account to remain unpaid for more than 90 days, Western made repeated demands to B&P to pay its outstanding invoices. Despite B&P's refusal to pay for its purchases, Western attempted to salvage its relationship with B&P by offering B&P a discount on the outstanding invoices, and a waiver of the $1,800 late fees that had accrued, if B&P would agree to settle its account. B&P rejected Western's offer. Thereafter, B&P did not attempt to purchase any additional products from Western. Accordingly, B&P terminated its relationship with Western - not the other way around. Because there is absolutely no factual support for any of the unfounded, conclusory allegations asserted by B&P, Western requests that the Court grant it summary judgment in its favor on all counts of the Counterclaim.

## Factual Background

**A.    Western's Relationship With B&P**.

For over 50 years, Western has been in the business of manufacturing and selling snow and ice removal equipment and accessories such as snowplows and snowplow assemblies.  (SMF ¶ 3.)  Western typically sells its products through selected outlets, which are authorized to purchase products from Western for retail sale to the general public.  (SMF ¶ 6.)  Western does not sell franchises.  (SMF ¶ 4.)  Selection as an outlet authorized to sell Western's products does not constitute the grant of a franchise or any other exclusive or special right to purchase or sell Western's products.  (SMF ¶ 22.)  Aside from the costs of the goods sold, Western does not charge its authorized outlets any franchise fee or other charges.  (SMF ¶ 5.)

B&P is a retail distributor that purchased snow and ice removal equipment and accessories from Western for resale to consumers.  (SMF ¶¶ 7, 8.)  Western and B&P never signed a written distributorship agreement.  (SMF ¶ 9.)  Western orally agreed to allow B&P act as an authorized outlet for Western's products and to purchase products from Western for resale to consumers.  (SMF ¶ 8.)

**B.    B&P Agreed To Be Bound By Western's Terms of Sale And Credit Policy**.

Every time that B&P purchased products from Western, it would receive an invoice for the purchases.  (SMF ¶ 13.)  The bottom of the invoices that B&P received contained the following language:

> A LATE FEE OF 18% PER YEAR WILL BE CHARGED ON ALL PAST DUE ACCOUNTS TO THE EXTENT PERMITTED BY APPLICABLE LAW.
>
> ALL SALES SUBJECT TO WESTERN PRODUCTS CREDIT POLICY, WARRANTY MANUAL, AND TERMS OF SALE PREVIOUSLY PROVIDED TO CUSTOMER.

(SMF ¶ 15.)

Section 3 of Western's Terms of Sale, entitled "Sole Terms and Conditions," notifies Western's authorized outlets, like B&P, that "your acceptance of any products and/or placement of any orders with Western Products indicates your assent to these terms of sale." (SMF ¶ 18.) Western provided B&P with copies of its Terms of Sale and Credit Policy, and by purchasing and accepting products from Western, B&P agreed to be bound by the Terms of Sale and Credit Policy. (SMF ¶¶ 16, 19.) The Terms of Sale that governed the purchases made by B&P specifically provided that Western reserved the right to sell to others and to decline to sell to an authorized outlet for any reason, in Western's sole discretion, at any time. (SMF ¶ 22.) In addition, the Terms of Sale specified that Western reserved the right to "discontinue, withdraw, or limit the sale of any and all products," at any time. (SMF ¶ 21.)

## C.   B&P's Overdue Account.

From November 2003 through March 2004, Western sold and delivered to B&P, and B&P purchased and accepted from Western, snow and ice removal equipment and accessories with a sales price of $118,727.12. (SMF ¶ 10.) Western continued to sell products to B&P through March 2004, even though some of the invoices for the products B&P had purchased from Western remained unpaid for more than three months. (SMF ¶ 36.) Western made repeated demands to B&P make payment on the outstanding invoices, yet B&P failed and refused to make any such payments. (SMF ¶ 23.) On April 13, 2004, Western sent a letter to B&P and demanded that B&P pay its outstanding invoices. (SMF ¶ 31.) In that letter, Western offered to allow B&P to take a 1% cash discount on the past due invoices if B&P paid off the balance of its account within 10 days of receipt of the letter. (SMF ¶ 33.) Western also offered to waive the late fees that had accumulated on B&P's account. (SMF ¶ 33.) Despite those repeated demands, B&P did not pay off the balance of its account and refused to make any

payments to Western.  (SMF ¶ 35.)  B&P did not attempt to purchase any additional products

from Western after it received the April 13, 2004 letter.  (SMF ¶ 37.)

The Terms of Sale and Credit Policy governing the purchases made by B&P required

payment in full within 30 days of the invoice date, and provided for a 1.5% service charge per

month on amounts overdue and unpaid.  (SMF ¶ 38.)  As of July 15, 2005, approximately

$29,171.10 of interest has accrued with respect to the amounts overdue and unpaid by B&P.

(SMF ¶ 40.)

### Standard Of Review

Summary judgment is appropriate when, as in this case, there are no genuine issues of

material fact and the moving party is entitled to judgment as a matter at law.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56(c).  A fact is "material" when it has the

"potential to affect the outcome of the suit under the applicable law," and an issue is "genuine"

when the evidence is "sufficient to support a rational resolution of the point in favor of either

party."  *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993).  The party

moving for summary judgment must demonstrate an absence of evidence to support the

nonmoving party's case.  *Celotex Corp.*, 477 U.S. at 325.

In determining whether the moving party has met its burden, the court must view the

record in the light most favorable to the nonmoving party and give that party the benefit of all

reasonable inferences in its favor.  *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997).  Once

the moving party has made a preliminary showing that no genuine issues of material fact exist,

"the nonmovant must contradict the showing by pointing to specific facts demonstrating that

there is, indeed, a trialworthy issue."  *National Amusements, Inc. v. Town of Dedham*, 43 F.3d

731, 735 (1st Cir. 1995) (citing *Celotex*, 447 U.S. at 324); Fed. R. Civ. P. 56(e).  "This is

especially true in respect to claims or issue on which the nonmovant bears the burden of proof."

*Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196,

200 (1st Cir. 1996) (citations omitted).

<u>**Argument**</u>

**I.    WESTERN IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS AGAINST B&P BECAUSE B&P ADMITS THAT IT HAS NOT PAID FOR ALL THE PRODUCTS IT PURCHASED FROM WESTERN.**

Western is entitled to summary judgment on its claims against B&P because it is

undisputed that: (1) B&P purchased snow and ice removal equipment from Western totaling

$118,727.12 (SMF ¶ 11); (2) the terms of sale governing B&P's purchases required payment

within 30 days of the invoice date (SMF ¶ 38); (3) Western repeatedly demanded that B&P pay

for the products it purchased (SMF ¶ 23); and (4) despite those demands, B&P has not paid

Western in full for its purchases (SMF ¶ 16).

The Massachusetts Legislature has adopted Article 2 of the Uniform Commercial Code

("UCC") entitled "Sales"  *See* M.R.S.A. 106 § 2-101 *et seq.*  The sales of Western's snow and ice

removal equipment and accessories to B&P were sales of goods within the meaning of Article 2

of the UCC.  *See* M.G.L.A. 106 § 2-105.  Pursuant to Section 2-109, Western is entitled to

recover the price of the goods that B&P purchased and accepted:

> When the buyer fails to pay the price as it becomes due the seller may recover,
> together with any incidental damages under section 106, § 2-710, the price
>
> > (a) of goods accepted or of conforming goods lost or damaged within a
> > commercially reasonable time after risk of their loss has passed to the
> > buyer; and
>
> . . .

MASS. GEN. LAWS ch. 106 § 2-109.  The sales price of the goods that Western sold and delivered

to B&P, and that B&P purchased and accepted from Western, totaled $118,727.12.  (SMF ¶ 11.)

Because B&P has not paid Western in full for the goods that it purchased, Western is entitled to summary judgment on its claims against B&P as a matter of law. *Id.*

The terms of sale that govern the purchases made by B&P also provide for a 1.5% service charge per month on amounts overdue and unpaid. (SMF ¶ 38.) As of July 15, 2005, unpaid interest in the amount of $29,171.10 has accrued with respect to the amounts overdue and unpaid by B&P. (SMF ¶ 40.) Accordingly, Western respectfully requests that the Court award it damages against B&P in the principal amount of $118,727.12, plus $29,171.10 in interest, plus interest on $118,727.12 accumulating at the rate of 1.5% per month after July 15, 2005.

## II. WESTERN IS ENTITLED TO SUMMARY JUDGMENT ON B&P'S COUNTERCLAIM BECAUSE WESTERN WAS JUSTIFIED IN NOT CONTINUING TO SELL PRODUCTS TO B&P ONCE B&P STOPPED PAYING FOR THE PRODUCTS IT RECEIVED.

Summary judgment may be appropriate "if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation." *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir. 1994). As long as "the nonmovant bears the ultimate burden of proof at trial, he [will] not [be able to] defeat a motion for summary judgment by relying upon evidence that is `merely colorable' or `not significantly probative.' To the contrary, the nonmovant [will have to] `present definite, competent evidence to rebut the motion.'" *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir. 1993) (citations omitted).

### A.    Western Never Refused To Sell Products To B&P

The basis for B&P's counterclaim against Western is the unsupported allegation that Western "suddenly, without any previous notice or warning" refused to supply B&P with snow and ice removal equipment, which allegedly caused B&P to lose a significant amount of its business. (Counterclaim ¶ 7.) According to B&P, Western's refusal to continue to sell products to B&P, even though B&P's account was more than 90 days overdue, somehow constituted a

restraint of trade under Sections 1 and 2 of the Sherman Act, and violated chapters 93 and 93A

of the Massachusetts General Laws.[2]  Those unsupported, conclusory allegations are directly

contradicted by the fact that Western never refused to sell products to B&P.  (SMF ¶ 37.)

After B&P had allowed its account to remain unpaid for more than 90 days, Western

made repeated demands to B&P to pay its outstanding invoices and settle its account.  (SMF ¶

23.)  For example, Western called B&P by telephone five times in March 2004 and demanded

that B&P pay its outstanding invoices.[3]  (SMF ¶¶ 25-29.)  On April 13, 2004, Western sent a

letter to B&P and demanded that B&P pay its outstanding invoices.  (SMF ¶ 31.)  In that letter,

Western offered to allow B&P to take a 1% cash discount on the past due invoices if B&P paid

off the balance of its account within 10 days of receipt of the letter.  (SMF ¶ 33.)  Western also

offered to waive the late fees that had accumulated on B&P's account.  (SMF ¶ 33.)  Despite

those repeated demands, B&P did not pay off the balance of its account and refused to make any

payments to Western.  (SMF ¶¶ 33-34.)

After B&P received the April 13, 2004 letter, it did not place any additional orders with

Western.  (SMF ¶ 37.)  Although B&P probably realized that Western would not sell it any

additional products until it paid off its account, the fact is that B&P rejected Western's offer to

take a cash discount on the unpaid invoices.  By failing to settle its account, B&P effectively

---

[2] B&P also alleged that Western wrongfully terminated its relationship with B&P and breached its contract with B&P, (Counterclaim ¶¶ 13, 14); however, B&P never identified the contract that Western allegedly breached, (*see generally* Counterclaim).  It is undisputed that Western never signed a written distributorship agreement with B&P. (SMF ¶ 9.)  Although Western orally agreed to allow B&P to act as an authorized outlet and to purchase products from Western for resale to consumers, all of B&P's purchases were subject to Western's Term of Sale.  (SMF ¶¶ 8, 15.)  B&P agreed to be bound by the Terms of Sale by accepting the products from Western.  (SMF ¶¶ 18,19.)  As discussed *infra*, the Terms of Sale specifically reserved Western's right to discontinue selling to any of its authorized outlets at any time, for any reason, in Western's sole discretion.  (SMF ¶¶ 20, 22.)  Accordingly, Western did not "wrongfully" terminate its relationship with B&P and B&P's breach of contract claim necessarily fails as a matter of law.

[3] Western employees called Peter Dus at B&P on March 2, 8, 18, 22, and 24.  (SMF ¶¶ 25-29.)  A Western employee also called B&P on April 5, 2004 and demanded that B&P pay its outstanding invoices.  (SMF ¶ 30.)

terminated its relationship with Western.  Any financial harm or damage to its business that B&P allegedly suffered was brought about by B&P's refusal to pay Western for the products it had purchased – not by any unlawful conduct on the part of Western.

Even if Western had refused to continue to sell products to B&P after B&P's account remained unpaid for more than 90 days, Western's refusal to sell would have been justified under the circumstances.  As noted *supra*, the relationship between B&P and Western was predominantly for the sale of goods, which is governed by Article 2 of the U.C.C.  Section 2-204(1) of the U.C.C. provides "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  MASS. GEN. LAWS ch. 106, § 2-204(1).

The invoices for the purchases made by B&P provided notice that B&P was accepting and agreeing to be bound by Western's Terms of Sale by placing an order with Western and receiving delivery of the purchased products.  (SMF ¶ 15.)  In *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453-54 (7th Cir. 1996), the Court of Appeals for the Seventh Circuit noted that, under the U.C.C., "a vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance.  A buyer may accept by performing the acts the vendor proposes to treat as acceptance."  *Id.* at 1452.  As "master of the offer," Western was entitled to request B&P to manifest its acceptance of the Terms of Sale by accepting delivery of its purchases from Western, and B&P affirmatively accepted the Terms of Sale when it accepted delivery of the products it purchased.  *ProCD,* 86 F.3d at 1452.

The Terms of Sale that governed B&P's purchases reserved Western's right to decline to sell to B&P for any reason, at any time, in Western's sole discretion.  (SMF ¶¶ 20, 22.)  The Terms of Sale also reserved Western's right to "discontinue, withdraw, or limit the sale of any

and all products," to B&P at any time.  (SMF ¶ 21.)  Accordingly, even if Western had decided to refuse to continue to sell products to B&P, Western's refusal would have been permissible under the Terms of Sale.

### B.    Western Did Not Wrongfully Terminate Its Relationship With B&P.

It is important to place Western's relationship with B&P in its proper context.  B&P is merely a reseller of Western's products – it is not an exclusive distributor or franchisee.  Western and B&P never signed a written distributorship agreement.  (SMF ¶ 9.)  Western does not sell franchises and its Terms of Sale make it clear that "approval as an authorized outlet in no way constitutes the grant of a franchise or other exclusive or special right to purchase or sell Western Products' products . . ."  (SMF ¶¶ 4, 22.)  Although Western orally agreed to allow B&P to act as an authorized resale outlet and purchase products from Western for resale to consumers, the purchases made by B&P were subject to Western's Terms of Sale.  (SMF ¶¶ 8, 15.)

Under Section 2-309 of the U.C.C.,[4] in the absence of an express agreement providing otherwise, an oral agreement for the sale of goods is terminable at will by either party upon giving reasonable notice.  *Teitelbaum v. Hallmark Cards Inc.*, 520 N.E.2d 1333, 1336 (Mass. Ct. App. 1998) ("Since there was no express agreement preventing termination, the arrangement that existed was terminable at the will of either party at any time upon reasonable notice"); *see also Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F. Supp. 683, 687 (D. Mass. 1991) (oral

---

[4] MASS. GEN. LAWS ch. 106, § 2-309 provides:

> (1) The time for shipment or delivery or any other action under a contract if not provided in this Article or agreed upon shall be a reasonable time.
>
> (2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.
>
> (3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.

distributorship agreement did not specify a duration and was terminable at will).  As discussed, Western did not "wrongfully terminate" its relationship with B&P because Western's records show that B&P never attempted to place any additional orders with Western after it received the April 13, 2004 letter.  (SMF ¶ 37.)  Nevertheless, even if the Court were to find that Western did terminate its relationship with B&P, such termination would have been lawful because Western provided reasonable notice to B&P that its account was more than 90 days overdue and provided B&P with numerous opportunities to settle its account.  (SMF ¶¶ 23-33); *see also* MASS. GEN. LAWS ch. 106, § 2-309.  Moreover, the fact that B&P refused to pay for the goods it purchased would have constituted "just cause" for its termination as an authorized resale outlet.  The Court of Appeals for the First Circuit has held that paying for goods on time is one of the "essential" terms of a sales contract, *see PPM Chemical Corp. of P.R. v. Saskatoon Chemical Ltd.,* 931 F.2d 138, 139 (1st Cir. 1991); *Biomedical Instrument & Equip. Corp. v. Cordis Corp*., 797 F.2d 16, 17 (1st Cir. 1986), and that failure to pay constituted "just cause" for terminating a relationship between a dealer and its distributor.  B&P breached its sales contracts with Western because it refused to pay for all of the products that it purchased and therefore, Western would have been justified in terminating its relationship with B&P.

Finally, it has long been recognized in Massachusetts and elsewhere that private businesses are generally free to deal with whomever they choose.[5]  *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) ("In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long-recognized right of trader or manufacturer engaged

---

[5] Under Massachusetts law, there is no statutory provision that specifically regulates the relationship between a snowplow equipment manufacturer and its distributors.  Unlike the statute regulating the relationship between auto manufacturers and their distributors, for example, in MASS. GEN. LAWS ch. 93B ("Regulation of Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers"), there is no general regulation of snowplow equipment distributors.

in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."'"); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *Remco Distribs., Inc. v. Oreck Corp.*, 814 F. Supp. 171, 175 (D. Mass. 1992) (*affirmed* 981 F.2d 1245 (1st Cir. 1992)) (citing *Colgate* and *Monsanto* and dismissing distributor's claim against manufacturer brought under Massachusetts anti-trust statute, MASS. GEN. LAWS ch. 93).

B&P's claims that Western wrongfully terminated its relationship with B&P, breached its contract with B&P, violated Sections 1 and 2 of the Sherman Act, and violated MASS. GEN. LAWS chs. 93 & 93A, fail as a matter of law.

## III.    B&P ALSO CANNOT MAKE OUT A PRIMA FACIE CASE UNDER SECTIONS 1 AND 2 OF THE SHERMAN ACT.

Summary judgment is useful "to isolate and dispose of factually unsupported claims," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), particularly in antitrust cases.  *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998).  It is an essential tool in the area of antitrust law because it helps avoid wasteful and lengthy litigation that may have a chilling effect on pro-competitive market forces.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593-94 (1986).  Here, B&P has failed to plead sufficient facts, and lacks sufficient evidence, to show that Western violated Sections 1 and 2 of the Sherman Act.

### A.    The Injury That B&P Allegedly Suffered Is Not An "Antitrust Injury" Under Sections 1 And 2 Of The Sherman Act.

"The antitrust laws . . . were enacted for `the protection of competition not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe*

*Co. v. United States*, 370 U.S. 294, 320 (1962)).  A plaintiff bringing a private action under the

Sherman Act bears the "initial burden to demonstrate the defendant's challenged behavior `had

an actual adverse effect on competition as a whole in the relevant market.'" *Geneva*

*Pharmaceuticals v. Barr Labs. Inc*., 386 F.3d 485, 506-07 (2nd Cir. 2004) (quoting *Capital*

*Imaging Assocs., P.C. v. Mohawk Valley Med. Ass'n, Inc*., 996 F.2d 537, 543 (2d Cir. 1993)

(emphasis in original)).  "[E]vidence that plaintiffs have been harmed as individual competitors

will not suffice." *Id*. at 507.

In *Brunswick Corp.*, the United State Supreme Court held that plaintiffs seeking damages

for alleged violations of the antitrust laws "must prove *antitrust* injury, which is to say injury of

the type the antitrust laws were intended to prevent and that flows from that which makes the

defendants' acts unlawful."  429 U.S. at 489 (emphasis in original).  The harm "should reflect the

anticompetitive effect either of the violation or of anticompetitive acts made possible by the

violation.  It should, in short, be 'the type of loss that the claimed violations . . . would be likely

to cause.'" *Id.*  (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125

(1969)); *see also Nelson v. Monroe Reg'l Med. Ctr.,* 925 F.2d 1555, 1564 (7th Cir. 1991)

(Antitrust injury "means injury from higher prices or lower output, the principal vices proscribed

by the antitrust laws.").

B&P has not alleged, let alone shown, that Western's refusal to continue to sell products

to B&P in the face of B&P's refusal to pay for the products it received is an "antitrust injury" that

the Sherman Act was intended to prevent.  (*See generally* Counterclaim.)  Although B&P alleged

that Western's refusal to continue to sell it products had an adverse impact on its business, an

injury to an individual competitor is not the legal equivalent of an injury to competition in the

relevant market.  *Brunswick Corp.,* 429 U.S. at 489.  Because B&P did not allege that Western's

actions has had an adverse effect on competition as a whole in a relevant market, B&P cannot

make out at a trialworthy claim under Section 1 and 2 of the Sherman Act.  *See Brunswick Corp.,*

429 U.S. at 489; *Geneva Pharmaceuticals*, 386 F.3d at 506-07.

In addition, because B&P merely alleges in its Counterclaim an injury to its business and

not to a more generalized market, B&P lacks standing to pursue its antitrust claims.  (*See*

*generally* Counterclaim.)  "A showing of antitrust injury is necessary but not always sufficient to

establish antitrust standing."  *Alberta Gas Chemicals Ltd. v. E.I. Du Pont de Nemours and Co.*,

826 F.2d 1235, 1240 (3d Cir. 1987), *cert denied* 486 U.S. 1059 (1988).  Although standing is

closely related to antitrust injury, the two concepts are distinct.  *Id.*  Once a plaintiff has

demonstrated an antitrust injury by showing a causal relationship between the harm and the

challenged aspect of the alleged violation, a court must determine whether the plaintiff has

standing to sue.  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n. 6 (1986)

(concluding that courts should examine other factors in addition to antitrust injury to determine

whether a party is a proper plaintiff).

"It is now well settled that in order to have standing to prosecute private antitrust claims,

plaintiffs must show more than that the defendants' conduct caused them an injury."  *Balaklaw v.*

*Lovell*, 14 F.3d 793, 797 (2d Cir. 1994).  The antitrust laws are only concerned with acts that

harm "allocative efficiency and raise[] the price of goods above their competitive level or

diminish[] their quality."  *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir.

1995), *cert denied,* 516 U.S. 987 (1995); *see also Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d

1051, 1055 (9th Cir. 1999) ("It is well established that the antitrust laws are only intended to

preserve competition for the benefit of consumers.").  In order to have standing, an antitrust

plaintiff must allege more than harm to its own business; it must allege and prove harm within

the market in which it competes.  *See Blaine v. Meineke Discount Muffler Shops, Inc*., 670 F.

Supp. 1107, 1114 (D. Conn. 1987); *see also Indeck Energy Servs. v. Consumers Energy Co*., 250

F.3d 972, 977 (6th Cir. 2000), *cert. denied,* 533 U.S. 964 (2001) (concluding that the plaintiff

lacked standing because the only harm allegedly suffered by the plaintiff was in the company's

capacity as a competitor in the marketplace, not as a defender of marketplace competition).

B&P lacks standing in the instant case because it cannot demonstrate an injury to

competition.  Although B&P alleged that Western's refusal to sell it products caused B&P to lose

business and suffer financial harm, B&P's counterclaim does not allege that Western's conduct

had an adverse impact on competition in general.  Because B&P has only alleged an injury to its

business and not to a relevant market in general, B&P cannot make out a claim for violations of

Sections 1 and 2 of the Sherman Act.  *See Indeck Energy Servs*., 250 F.3d at 977; *Balaklaw*, 14

F.3d at 797; *Blaine*; 670 F. Supp. at 1114.

**B.    Western Did Not Conspire To Restrain Trade In Violation Of Section 1 Of The Sherman Act.**

Section 1 of the Sherman Act <u>only</u> prohibits contracts, combinations, or conspiracies in

restraint of trade or commerce.[6]  *See* 15 U.S.C. § 1.  A plaintiff must prove three elements to

recover under Section 1 of the Sherman Act: (1) a contract, combination or conspiracy among

two or more independent actors; (2) that unreasonably restrains trade; and (3) is in, or

substantially affects, interstate or foreign commerce.  *See Copperweld Corp. v. Independence*

*Tube Corp.*, 467 U.S. 752, 768 (1984); *Podiatrist Ass'n, Inc. v. La Cruz Azul de P.R., Inc*., 332

F.3d 6, 13 (1st Cir. 2003).  The plaintiff has the burden of making at least a prima facie showing

---

[6] Section 1 of the Sherman Act provides that: "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.  Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony . . ."  15 U.S.C. § 1 (2004).

of concerted action among two or more independent actors. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984); *Garment Dist., Inc. v. Belk Stores Servs., Inc.*, 799 F.2d 905, 911 (4th Cir. 1986). Thus, the relevant inquiry is whether B&P has alleged that Western combined, contracted, or conspired with others to restrain trade in violation of Section 1, and whether B&P can present any evidence to support its allegations. *Monsanto*, 465 U.S. at 764.

To establish a conspiracy claim under Section 1, B&P must prove the existence of a "meeting of the minds" or "an agreement" to carry out an unlawful scheme. *See Monsanto Co.*, 465 U.S. at 768. Absent direct evidence of an agreement, B&P bears the burden of showing that circumstantial evidence raises a legal inference of conspiracy. In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), the Supreme Court cautioned that in Sherman Act cases, the permissible inferences that a court can draw from ambiguous evidence are quite limited. *Id.* at 587. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy . . . To survive a motion for summary judgment . . . a plaintiff . . . must present evidence `that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (citations omitted).

B&P's counterclaim does not contain a single allegation that Western contracted, combined, or conspired with any other entity to restrain trade in violation of Section 1 of the Sherman Act.[7] Instead, it merely states, in the most conclusory manner, that "*Western's* refusal to deal with B&P constituted a restraint of trade under 15 U.S.C. Sections 1 and 2." (Counterclaim ¶ 9) (emphasis added). It is black letter law that Section 1 only applies to concerted activity and "does not reach conduct that is 'wholly unilateral.'" *Copperweld*, 467 U.S.

---

[7] Moreover, there is absolutely no evidence that Western conspired with any other entity to intentionally undermine B&P's competitiveness in the market.

at 768 (quoting *Albrecht v. Herald Co.*, 390 U.S. 145, 149 (1968)) (emphasis added). Because B&P failed to allege that Western contracted, combined, or conspired with any other independent entity to restrain trade, and because there is a complete absence of any evidence of such a contract, combination, or conspiracy, B&P's Section 1 claim fails as a matter of law.

    **C.**    **B&P's Section 2 Claims Fail Because B&P Did Not Allege That Western Has Monopoly Power Or The Specific Intent To Monopolize The Relevant Market.**

Section 2 of the Sherman Act holds liable "every person who shall monopolize, or attempt to monopolize, or combine or conspire to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. It prohibits three distinct types of anticompetitive activity – monopolization, attempted monopolization, and conspiracy to monopolize – and the burden of proof differs with respect to each claim. Like its Section 1 claim, B&P Section 2 claim fails as a matter of law because B&P's Counterclaim failed to allege any of the necessary factual predicates to establish a prima facie case for a Section 2 violation.

To prevail on a monopolization claim, a plaintiff must allege and prove (1) that the defendant has monopoly power in the relevant market and (2) that the defendant "has engaged in impermissible `exclusionary' practices with the design or effect of protecting or enhancing its monopoly position." *Coastal Fuels of Puerto Rico, Inc., v. Caribbean Petroleum Corp.*, 79 F.3d 182, 195-96 (1st Cir.), *cert. denied*, 519 U.S. 927 (1996). Attempted monopolization requires allegations and proof of (1) anti-competitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a dangerous probability that the attempt will succeed. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993); *see also CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985), *cert. denied*, 475 U.S. 1016 (1986). Finally, conspiracy to monopolize requires allegations and proof of (1) concerted action; (2) overt acts in furtherance of the

conspiracy; and (3) specific intent to monopolize.[8]  *See United States v. Yellow Cab Co.*, 332 U.S. 218, 225 (1947).

The only allegation in the Counterclaim relating to a violation of Section 2 is found in paragraph 9 which states: Western's refusal to deal with B&P constituted a restraint of trade under 15 U.S.C. Sections 1 and 2." (Counterclaim ¶ 9.)  Based on that allegation, B&P's Counterclaim does not even mention, let alone state a claim, for monopolization, attempted monopolization, or conspiracy to monopolize.[9]  Moreover, B&P failed to allege any of the necessary factual predicates to support any claim under Section 2.

As a preliminary point, in all three types of claims under Section 2, B&P must first define the relevant market, *see United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966), *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002), which "requires the identification of some economic market in which power can be measured and the consequences of the act or transaction assessed." *Eastern Food Services, Inc. v. Pontifical Catholic University Services Ass'n, Inc.*, 357 F.3d 1, 5 (1st Cir. 2004).[10]  The Supreme Court has ruled that, to establish a claim under Section 2 of the Sherman Act, it is "necessary to appraise the

---

[8] B&P's burden of proof for a claim of conspiracy to monopolize under Section 2 of the Sherman Act is higher than that required for a Section 1 conspiracy claim. *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573-75 (11th Cir. 1991).  B&P must show not only evidence of concerted action but also a shared intent to monopolize the relevant market.  *Id.*

[9] Indeed, the word "Monopoly" is not mentioned anywhere in the Counterclaim.  (*See generally* Counterclaim.)  The allegation that Western's refusal to deal with B&P "constituted a restraint of trade" is classic language referring to a claim under Section 1, which prohibits contracts, combinations, or conspiracies *in restraint of trade*.  Section 2, on the other hand, does not prohibit unlawful restraints of trade -- it prohibits parties from monopolizing, attempting to monopolize, or conspiring to monopolize trade.

[10] The relevant market consists of two separate components: a product market and a geographic market.  *See e.g. United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 619 (1974); *Brown Shoe*, 370 U.S. at 311.  The relevant product market is determined by the nature of the commercial entities involved and by the nature of the competition that they face.  *See e.g., United States v. Cont'l Can Co.*, 378 U.S. 441, 456-57 (1964).  The relevant geographic market is the area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994), *cert. denied*, 513 U.S. 1150 (1995).

exclusionary power of the [defendant's conduct] in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure [defendant's] ability to lessen or destroy competition." *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965). In its Counterclaim, however, B&P did not identify any relevant market, which is fatal to its Section 2 claims.[11] (*See generally* Counterclaim.)

With respect to a monopolization claim, B&P has not alleged, nor can it show, that Western possesses monopoly power, which the Supreme Court defined as "the power to control prices or exclude competition." *Grinnell Corp.*, 384 U.S. at 571. Without such an allegation or showing, B&P cannot prevail on a monopolization claim. Similarly, an attempted monopolization under Section 2 requires an allegation and proof of a specific intent to monopolize and a dangerous probability that the attempt will succeed. *See Spectrum Sports*, 506 U.S. at 459. B&P's Counterclaim does not allege that Western intended to monopolize a particular market, nor does it allege that there is a strong probability that Western would succeed. (*See generally* Counterclaim.) Finally, B&P cannot make out a prima facie case against Western for conspiracy to monopolize because, like its Section 1 claim, B&P failed to allege that Western conspired with another entity to violate Section 2. Accordingly, B&P's allegation that Western violated Section 2 of the Sherman Act fails as a matter of law.

## Conclusion

For the foregoing reasons, this Court should enter an order granting summary judgment in favor of Western on its Complaint against B&P and on B&P's Counterclaim against Western.

---

[11] B&P also failed to designate an expert witness to define the relevant market or testify about antitrust economics.

Dated: July 15, 2005                    /s/ Christopher R. Drury
                                        Christopher R. Drury, Mass. Bar No. 181400
                                        cdrury@pierceatwood.com

                                        Jeffrey M. White, Maine Bar No. 1287
                                        jwhite@pierceatwood.com

                                        PIERCE ATWOOD
                                        One Monument Square
                                        Portland, ME  04101
                                        207-791-1100

                                        *Attorneys for Plaintiff Douglas Dynamics, LLC
                                        d/b/a/ Western Products*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 15, 2005, I electronically filed **PLAINTIFF'S MOTION**

**FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW**

with the Clerk of Court using the CM/ECF system.  I also served a copy of the same, via First-

Class Mail, postage prepaid, upon the following:

> Jack E. Houghton, Jr.
> 78 Bartlett Avenue
> Pittsfield, MA 01201
> (413) 447-7385

DATED:  July 15, 2005

> /s/  Christopher R. Drury
> Christopher R. Drury
> cdrury@piercatwood.com
>
> PIERCE ATWOOD LLP
> One Monument Square
> Portland, ME  04101
> (207) 791-1100
>
> *Attorney for Plaintiff Douglas Dynamics, LLC*
> *d/b/a/ Western Products*